# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DEWANNA JOHNSON, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:25-cv-418 |
| PROVIDENCE HOMEOWNERS | § | Judge Mazzant |
| ASSOCIATION and FIRSTSERVICE | § | |
| RESIDENTIAL TEXAS, INC. | § | |
| | § | |
| *Defendants.* | § | |
| | | |
| MCKINNEY HOUSING AUTHORITY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:25-cv-467 |
| PROVIDENCE HOMEOWNERS | § | Judge Mazzant |
| ASSOCIATION and FIRSTSERVICE | § | |
| RESIDENTIAL TEXAS, INC., | § | |
| | § | |
| *Defendants.* | § | |
| | | |
| DENTON HOUSING AUTHORITY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:25-cv-774 |
| PROVIDENCE HOMEOWNERS | § | Judge Mazzant |
| ASSOCIATION and FIRSTSERVICE | § | |
| RESIDENTIAL TEXAS, INC., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are several motions in the above styled cases, which the Court considers in tandem for the purpose of resolving the Motions to Dismiss in each (the "Motions"). Having considered the Motions and the relevant pleadings, the Court finds as follows:

- In Civil Action No. 4:25-cv-418 ("*Johnson*"), Defendant Providence Homeowners Association Inc.'s Motion to Dismiss (Dkt. #17) is **GRANTED in part** and **DENIED in part**, and Defendant FirstService Residential Texas, Inc.'s Motion to Dismiss (Dkt. #16) is **GRANTED in part** and **DENIED in part.**

- In Civil Action No. 4:25-cv-467 ("*McKinney*"), Defendant Providence Homeowners Association Inc.'s Motion to Dismiss (Dkt. #21) is **GRANTED in part** and **DENIED in part**, and Defendant FirstService Residential Texas, Inc.'s Motion to Dismiss (Dkt. #20) is **GRANTED in part** and **DENIED in part.**

- In Civil Action No. 4:25-cv-774 ("*Denton*"), Defendant Providence Homeowners Association Inc.'s Motion to Dismiss (Dkt. #10) is **DENIED**, and Defendant FirstService Residential Texas, Inc.'s Motion to Dismiss (Dkt. #11) is **DENIED**.

## BACKGROUND

These discrimination cases arise under the Fair Housing Act. In 2022, Providence Homeowners Association Inc.'s ("PHOA"), with the assistance of its property manager, FirstService Residential Texas, Inc. ("FirstService") (together with PHOA, "Defendants"), implemented new housing rules in the Town of Providence Village, an outer-ring suburb of Dallas, Texas ("Providence"). The rules included a ban on rentals to tenants who use government rent subsidies to pay rent (the "Voucher Ban"):

> **Section 8 Housing Restriction.** A Rent House may not be used for a publicly financed or subsidized housing program, such as Section 8 Housing.[1]

---

[1] The rest of the rules, as originally enacted, provided that:

> **One Rent House Limit.** A person may only own one Rent house in the Subdivision at a time. "Rent House" means an occupied house that is (x) not an Owner Occupied Home, or (y) a house that has been vacant for three (3) or more months. "Owner Occupied Home" means a house in which at least one occupant is an Owner or Owner's spouse or is related to an Owner or Owner's spouse by blood, marriage, adoption, or formal guardianship, and for which occupants do not pay rent . . . .

> **Initial Owner Occupancy Term.** An Owner must reside in the home for the first twenty-four (24) consecutive months after acquiring an ownership interest in the home before the Owner may rent or lease the home pursuant to these Lease Rules.

(*Johnson*, Dkt. #11 at pp. 13–14; *McKinney*, Dkt. #16 at pp. 15–16; *Denton*, Dkt. #1 at p. 13) (ellipses in the complaints)).

Plaintiffs, comprised of current and former Providence tenants and two fair housing nonprofit organizations,[2] assert claims including intentional race discrimination and disparate-impact race and sex discrimination.

In each case, Defendants moved to dismiss for failure to state a claim. Plaintiffs opposed that relief, and a flurry of filings followed. Defendants' primary argument is that a recent Fifth Circuit case (addressing housing-discrimination claims based on voucher bans like the one challenged here) requires dismissal at the pleading stage. Each Plaintiff argues that their case is distinguishable.

I.    **Factual Background.**

A.    **The Housing Choice Voucher Program**

The federal Housing Choice Voucher Program pays rental subsidies to aid "low-income families in obtaining a decent place to live" and to "promot[e] economically mixed housing." 42 U.S.C. § 1437f(a). The voucher program is funded by the United States Department of Housing and Urban Development (HUD) and administered by state and local public housing authorities in accordance with HUD regulations. When a rent payment exceeds a specified percentage of a family's monthly income, the voucher program pays the balance.

Once admitted to the voucher program, program participants are responsible for finding a landlord in the private rental market willing to rent to them. 24 C.F.R. § 982.302(a). Landlords who participate in the program are responsible for screening prospective tenants and rejecting them if

---

[2]    In the *Johnson* case, Plaintiffs Dewanna Johnson, Sheilla Nathan, Alonzo Tutson, Evora Sykes, Chanell Hobbs, Revisha Silas, and Evette Townsend (together, the "*Johnson* Plaintiffs") bring suit. In the *McKinney* case, the McKinney Housing Authority ("McKinney Housing") brings suit. And in the *Denton* case, the Denton Housing Authority ("Denton Housing") brings suit.

the screening reveals red flags in terms of their ability to pay rent, utility bills, care for the rental housing, respect neighbors, avoid criminal activity, and similar issues. *Id*. § 982.307(a).

### B.      Events Leading up to the Voucher Ban

Plaintiffs allege that as the concentration of black residents increased in Providence from 2018 to 2022, so did residents' complaints about crime, property maintenance, and property values.[3] From 2018 to 2022, the number and concentration of black residents in Providence increased. As of 2022, Providence households were 74% white and 14% black.

Around July 2021, following an altercation between a black teenager and a white teenager, residents allegedly began blaming voucher holders for crime and other problems in Providence, often using language like "ghetto." At the time, only 4% of households in providence used vouchers, and 93% of those households were occupied by black families. Over the next few months, Cody Watson ("Watson"), a FirstService employee, worked with PHOA's Board of Trustees (the "Board") to draft new rental rules. The rules included the Voucher Ban.

The Board's governing documents did not give it authority to enact the rules without a favorable vote from the majority of property owners. On November 30, 2021, Jennifer Dautrich ("Dautrich"), who served as vice president of the Board until she became president in April 2022, proposed amending PHOA's governing documents to give the Board the authority to adopt rental and leasing rules unilaterally (the "Amendment"). In support of the rules, Dautrich discussed property maintenance issues and crime in the general area, but she allegedly did not support her

---

[3]   (*Johnson*, Dkt. #11 at p. 7; *McKinney*, Dkt. #16 at pp. 8–12; *Denton*, Dkt. #1 at p. 2). Unless otherwise indicated, the remaining factual background is derived from the *Johnson* complaint (*Johnson*, Dkt. #11), the *McKinney* complaint (*McKinney*, Dkt. #16), the *Denton* complaint (*Denton*, Dkt. #31), or documents attached thereto (*Johnson*, Dkt. #11-1; *McKinney*, Dkt. #16-1). The Plaintiffs in all cases cite to HUD's Charge of Discrimination, which two Plaintiffs attached to their respective complaints (*Johnson*, Dkt. #11-1; *McKinney*, Dkt. #16-1).

conclusions with data. Plaintiffs allege that certain data Defendants later provided during a HUD investigation was obtained post hoc and unreliable.

Voting for the Amendment opened on February 7, 2022. Plaintiffs allege that Defendants departed from past procedure by holding the vote open indefinitely, which they had not done for prior amendments.[4] In response to questions by residents, FirstService included a "Q&A" section in a weekly newsletter email. The Q&A stated that no lease would be terminated immediately.

Plaintiffs allege that, in response to the purported crime and maintenance issues that drove Defendants to consider new rental and leasing rules, landlords with voucher tenants asked the Board for additional details so they could address any problems caused by the voucher tenants. According to Plaintiffs, the Board never responded.

While voting was ongoing, Plaintiffs allege that social media posts about voucher holders in unofficial social media groups for Providence residents were rampant. One post showed the mug shots and arrest record for a black man, which the post presumed was a voucher holder, with the caption "Damn this ghetto ass neighborhood is on a roll!!! Hide Your kids cause section 8 is on the loose!!!" Dautrich allegedly responded to the post, stating that "[f]or some reason our zip code has become a hub for section 8 [voucher holders]," and "only so many should be allowed in any neighborhood." Allegedly, she also wrote that "with all of these old charges he shouldn't be allowed to participate in the govt housing assistance program," "How many people still need to vote on the amendment?" and "we don't have anything in place about renters in our HOA . . . . Again, people need to vote yes." And Although Plaintiffs do not specify when this comment occurred, Plaintiffs

---

[4]  Denton Housing further alleges that other proposed amendments during this same period that were not left open indefinitely failed for lack of majority vote.

allege that another Board member wrote "it's called Section 8 . . . It seems like the neighborhood is plagued with convicts, GET OUT!!!"[5]

Around April 2022, Dautrich organized a group of homeowners (including another Board member) to form an Amendment Committee, which went door-to-door to persuade homeowners to vote for the Amendment. Allegedly, no prior amendments prompted the formation of a special committee, a coordinated canvasing campaign, or Defendants' level of promotion.

### C.    The Amendment and Voucher Ban's Passage

In May 2022, the Amendment received enough votes to pass, prompting Watson to close online voting. On June 6, 2022, the Board voted unanimously to approve new rental rules, which included the Voucher Ban. According to Plaintiffs, nothing in the rules' text would prevent immediate enforcement despite Defendants' earlier representations that no lease would end immediately. The Board announced that enforcement would begin in ninety days, and Watson allegedly told some residents that it would begin in as little as thirty days.

Allegedly, the Board later stated that current residents could finish their lease terms (up to twelve months), but landlords immediately started telling voucher tenants that they had to move, leading to frantic searches for alternative housing. In the wake of the rules' enactment, nineteen voucher households moved away from Providence. Some of the *Johnson* Plaintiffs allege they had to quickly find new schools for their children because landlords asked them to move before their lease term ended.

---

[5]  The *Johnson* Plaintiffs and McKinney Housing allege that, in response to posts calling voucher holders "ghetto," "trash," "lazy," "riff raff," and "wild animals," Board members responded with positive reaction emojis or used the posts to promote the Amendment. No dates for these posts or responses are provided.

On June 8, 2022, several residents who opposed the Amendment gathered in a park to discuss the vote. An Amendment Committee member allegedly photographed the group, which included children, and another resident posted the photograph to social media with the caption "Here's a great pic depicting the very Fu*king Idiots that help to Ruin our lovely town of Providence Village!!"

The incident was allegedly reported to Watson and the Board. Despite mediating other neighborhood disputes involving issues like dogs barking, the only action Watson and the Board allegedly took was to put a reminder in the weekly newsletter to uphold community standards. Plaintiffs allege that after the Voucher Ban's enactment, racist and sometimes threatening social media posts continued to fill Providence's unofficial social media groups.[6] According to Plaintiffs, Defendants had knowledge of the social media posts and discussed them.

### D.    PHOA Agrees to a Stay and Amends the Rental Rules

On August 5, 2022, PHOA entered into an agreement with HUD to stay enforcement of the new rules. On June 18, 2023, Texas passed a state law barring associations from restricting property owners' choice of tenants based on the tenant's source of income, which became effective on September 1, 2023.

Plaintiffs allege that during the summer and fall of 2023, racial tensions in Providence related to voucher holders continued to build. In July and November 2023, an alleged white

---

[6] The *Johnson* Plaintiffs and McKinney Housing allege that the posts referred to voucher-holders as "wild animals" and "lazy entitled leeching TR@SH," while another post refenced "the hood mentality." An unidentified person posted an image of a black woman wearing a Halloween costume labeled "Providence Village Renter," which also said "sassy attitude," "weapons," "a section 8 voucher," "24 hours to live," and "PREVIOUS FELONY CONVICTIONS INCLUDED!!!!" Denton Housing points to many of the same posts, and also alleges that on August 11, 2022, a Board member posted that a voucher holder that spoke to the media about the Voucher Ban "comes across as pure trash . . . ." and that that she is a "mother(technically)," and "Nor do you ask for a stranger to babysit your children over night so you can go out. Haven't you figured out already how you got the first 5 kids?"

nationalist organization protested outside Providence with fliers that claimed that an overwhelming majority of Section 8 recipients are black and bring "unimaginable violence."

In February 2024, the Board met with a state representative, allegedly to discuss alternative ways to get voucher holders out of Providence. The representative allegedly suggested that the Board establish caps on community rental percentages to limit Section 8 growth.

On May 10, 2024, the Board adopted an amended set of rental rules, which omitted the Voucher Ban but limited owners to one rental property each. The amended rules also limited rental units to twenty-five percent of the lots in Providence. Plaintiffs allege that this rule, in practice, had similar results as the Voucher Ban, and was enacted with the same intent. They also allege that the amended rules violated the terms of Defendants' agreement with HUD.

On January 14, 2025, HUD issued a Charge of Discrimination against Defendants, Dautrich, and Watson, regarding fifty-three administrative complaints of discrimination.

McKinney Housing and Denton Housing both allege they suffered damages caused by Defendants' discriminatory rules. McKinney Housing alleges that two of its clients were evicted, causing it to incur significant costs coordinating short-notice relocations, as well as labor and other costs. Denton Housing claims, among other things, that it had to move several families outside of Providence, diverting resources away from its routine activities. The *Johnson* Plaintiffs are current or former Providence tenants who allege they were forced to move prior to the expiration of their lease.[7] They also allege that they experienced racial insults, hostility, and threats on Providence social media groups before and after the Voucher Ban and the other rental rules were passed.

---

[7] One of the *Johnson* Plaintiffs alleges she was forced to convert her "rental voucher into a homeownership voucher" to remain in her home after unsuccessfully looking for other housing.

## II.    Procedural History.

### A.    *Johnson*

The *Johnson* Plaintiffs filed suit on April 22, 2025 (*Johnson*, Dkt. #1). Defendants moved to dismiss the case (*Johnson*, Dkt. #8; Dkt. #9). The *Johnson* Plaintiffs filed an amended complaint (*Johnson*, Dkt. #11), and the Court denied the motions to dismiss as moot (*Johnson*, Dkt. #18; Dkt. #19). Defendants filed new motions to dismiss, which are opposed (*Johnson*, Dkt. #16; Dkt. #17; Dkt. #27; Dkt. #29). Defendants filed replies (*Johnson*, Dkt. #44; Dkt. #45).

### B.    *McKinney*

McKinney Housing filed suit on May 2, 2025 (*McKinney*, Dkt. #1). Defendants filed motions to dismiss (*McKinney*, Dkt. #10; Dkt. #11). McKinney Housing amended its complaint, and the Court denied the motions to dismiss as moot (*McKinney*, Dkt. #16; Dkt. #23; Dkt. #24). Defendants filed new motions to dismiss, which are opposed (*McKinney*, Dkt. #20; Dkt. #21; Dkt. #30; Dkt. #31). Defendants filed replies (*McKinney*, Dkt. #39; Dkt. #41).

### C.    *Denton*

Denton Housing filed suit on July 21, 2025 (*Denton*, Dkt. #1). Defendants moved to dismiss the case (*Denton*, Dkt. #10; Dkt. #11). Denton Housing opposes the motion (*Denton*, Dkt. #15; Dkt. #16). Defendants replied, and Denton Housing filed sur-replies (*Denton*, Dkt. #23; Dkt. #25; Dkt. #31; Dkt. #32).

## LEGAL STANDARD

## I.    Federal Rule of Procedure 12(b)(6).

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each

claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id*. "This standard 'simply calls for enough facts

to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (per curiam) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## II.    The Fair Housing Act.

The Fair Housing Act "prohibits discrimination in the sale or rental of housing." *Avalon Residential Care Homes, Inc. v. GE Fin. Assur. Co.*, No. CIV.A.3:02-CV-0631-L, 2002 WL 32359947, at *2 (N.D. Tex. Oct. 18, 2002), *aff'd*, 72 F. App'x 35 (5th Cir. 2003). As originally enacted in 1968, the Act prohibited discrimination based on race, color, religion, or national origin. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n.1 (1995). Congress later "extended coverage to persons with handicaps and also prohibited 'familial status' discrimination, i.e., discrimination against parents or other custodial persons domiciled with children under the age of 18" in 1988. *Id.* (citing 42 U.S.C. § 3602(k)).

Section 3604(a) of the Act makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race . . . ." 42 U.S.C. § 3604(a).

Section 3604(b) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ." *Id.* § 3604(b).

Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, . . . any right granted or protected by section . . . 3604." *Id.* § 3617.

"The provisions of 42 U.S.C. [§] 3604 are to be given broad and liberal construction, in keeping with Congress' intent in passing the Fair Housing Act of replacing racially segregated housing with 'truly integrated and balanced living patterns.'" *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) (quoting *Trafficanti v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972)). Courts have "consistently given an expansive interpretation to the Fair Housing Act; to state a claim under the Act, it is enough to show that race was a consideration and played some role in a real estate transaction." *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (citing *Moore v. Townsend,* 525 F.2d 482, 485 (7th Cir. 1975)); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1556 (5th Cir. 1996) (holding that race must be a "significant factor" motivating the adverse housing decision (citing *Polanco v. City of Austin*, 78 F.3d 968, 977–78 (5th Cir. 1996)).

## ANALYSIS

The central question before the Court is whether *Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019) ("*Lincoln Property*") requires dismissal of Plaintiffs' claims at the pleading stage. In part, it does. Under *Lincoln Property*, Plaintiffs fail to state a disparate-impact claim because they do not plausibly allege robust causation. Plaintiffs, however, state a disparate-treatment claim by plausibly alleging that the Voucher Ban was motivated by race. Other theories—unaddressed by *Lincoln Property* and less explored by the case law—also survive dismissal at this stage.

I.      **Plaintiffs fail to state a disparate-impact claim under *Lincoln Property*.**

The Court first summarizes *Lincoln Property*'s disparate-impact analysis. Then, it applies that analysis to the cases at hand. Ultimately, the Court finds that *Lincoln Property* forecloses Plaintiffs' disparate-impact claims because Plaintiffs do not plausibly allege that the challenged policies caused black or female renters to be the dominant group of voucher holders prior to the policies' implementation, or that a change in the policies' enforcement caused a disparate impact.

A.      **Disparate-Impact Liability After *Lincoln Property***

In *Lincoln Property*, a non-profit housing organization challenged a no-voucher policy for discrimination under the Fair Housing Act. 920 F.3d at 895. The plaintiff asserted a disparate-impact claim, alleging that the defendants' "policy of declining to negotiate with or rent to voucher holders disparately impacts black households as evidenced by statistics establishing that more than 80% of the voucher holders in the Dallas area are black." *Id.* at 898. The question became whether the plaintiff viably alleged causation under *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) ("*ICP*"). *Id.* at 901.

Prior to *ICP*, the Fifth Circuit adhered to "HUD's burden-shifting approach" when evaluating disparate-impact claims. *Lincoln Property*, 920 F.3d at 901. That approach required the plaintiff to "prove a prima facie case of discrimination by showing that the challenged practice "causes a discriminatory effect." *Id.* (citing 24 C.F.R. § 100.500(c)(1)). Then, the burden shifted to the defendant to prove that the practice is "necessary to achieve one or more of the defendant's substantial, legitimate, nondiscriminatory interests." *Id.* (citing 24 C.F.R. § 100.500(c)(2)). Then, the burden shifted back, requiring the plaintiff to show that the defendant's interests could be

served with a practice that had "a less discriminatory effect." *Id.* at 901–02 (quoting 24 C.F.R. § 100.500(c)(3)).

The Fifth Circuit concluded that *ICP* "undoubtedly announce[d] a more demanding test" than this Circuit previously adhered to. *Id.* at 902. The Fifth Circuit relied on, *inter alia*, the following paragraphs from *ICP* to reach that conclusion:

> A disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A *robust causality* requirement ensures that "racial imbalance does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas and serious constitutional questions then could arise.
>
> * * *
>
> Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.

*Lincoln Property*, 920 F.3d at 902–03 (citation modified).

After determining that *ICP* compelled a stricter "robust causality" requirement, the Fifth Circuit's next task became determining how strict it should be. *Id.* at 903. To that end, the Fifth Circuit examined four opinions addressing the issue. *Id.* at 903–04.

The first opinion was *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017). *Id.* at 904. There, low-income housing owners alleged that the city targeted their properties through inspections, citations for non-existent code violations, and threats to revoke their rental licenses, disparately impacting classes protected by the FHA. *Id.* (citing *Ellis*, 860 F.3d at 1108–09). The Eighth Circuit found that the complaint fell short because it suggested no more than disagreement

14

between the plaintiffs and the city over reasonable housing-code provisions. *Id.* (citing *Ellis*, 860 F.3d at 1113). It also found that the complaint "lacked factually supported allegations that those provisions are arbitrary or unnecessary to health and safety." *Id.* (citation modified). The Fifth Circuit interpreted *Ellis* to require an "an artificial, arbitrary, and unnecessary policy causing the problematic disparity" to "establish a prima facie disparate impact case." *Id.* (citation modified).

*Lincoln Property* then considered the majority opinion in *Reyes v. Waples Mobile Home Park Ltd. Paternership*, 903 F.3d 415 (4th Cir. 2018). *Id.* There, a mobile home park "began enforcing a previously unenforced policy requiring all adult occupants" to show proof of lawful presence in the United States before renewing their leases, under the threat of eviction. *Id.* (citing *Reyes*, 903 F.3d at 419–20, 428). The plaintiffs alleged that this "disproportionately affected Latino families because Latinos comprised 64.6% of the undocumented immigrant population and are ten times more likely than non-Latinos to be adversely affected . . . ." *Id.* (citation modified). The *Reyes* majority held that the plaintiffs stated a claim because they alleged that the "first-time enforcement of a previously unenforced policy . . . caused a disproportionate number of Latinos to face eviction . . . compared to the number of non-Latinos who faced eviction." *Id.* (citation modified). Conceding that the *Reyes* majority opinion "arguably" allows a plaintiff to state a claim by alleging that a policy "impacts a protected class more than others," the Fifth Circuit found that a "narrower construction . . . [was] warranted" in light of *ICP*'s guidance. *Id.* at 906. *Lincoln Property* thus construed *Reyes* to require not just a disparate impact, but one caused by a "*change* in the defendant's enforcement of its policy" to state a claim. *Id.*

The Fifth Circuit also considered the *Reyes* dissent. *Id.* at 904–05. The dissent reasoned that the policy disparately impacted Latinos "not because they are Latino, but because Latinos are the

predominant sub-group of undocumented aliens in a specific geographical area." *Id.* at 905 (citing *Reyes*, 903 F.3d at 434–35 (Keenan, J., dissenting)). Despite the "statistical imbalance [causing Latinos to be more affected]," the dissent concluded that the plaintiffs failed to state a claim because "all occupants of the park must comply with the policy addressing their immigration status"—regardless of race. *Id.* (quoting *Reyes*, 903 F.3d at 434 (Keenan, J., dissenting)). Robust causation, in Judge Keenan's view, cannot be established by "pre-existing conditions" (such as Latinos constituting the "predominant sub-group of undocumented aliens") that are "*not* brought about by the challenged policy." *Id.*

The final opinion the Fifth Circuit considered in its mission to construe robust causation was *Oviedo Town Center, II, L.L.P. v. City of Oviedo*, 759 F. App'x 828, 833–35, No. 17-14254, 2018 WL 6822693, *4 (11th Cir. Dec. 28, 2018) (per curiam) (unpublished). *Id.* The Fifth Circuit highlighted that *Oviedo* relied on *ICP* to urge courts to "avoid interpreting disparate impact liability to be so expansive to inject racial considerations into every housing decision." *Lincoln Property*, 920 F.3d at 905 (citation modified). In *Oviedo*, developers of an affordable housing complex challenged a city's decision to increase utility rates, alleging the increase caused a disparate impact because more heads of households in the complex were minorities than in the rest of the city. *Oviedo*, 759 F. App'x at 830, 833. In the Eleventh Circuit's view, "if a disparate impact claim could be found on nothing more than a showing that a policy impacted more members of a protected class than non-members of protected classes, disparate impact liability undeniably would overburden cities and developers." *Lincoln Property*, 920 F.3d at 905 (quoting *Oviedo*, 759 F. App'x at 834). The *Oviedo* plaintiffs failed to make a prima facie case because the utility rate increase did not robustly

cause minorities to be a higher percentage of the heads of households in the complex relative to the rest of the city. *Id.*; *Oviedo*, 759 F. App'x at 835.

The Fifth Circuit then set out to apply the principles it derived from these opinions. Ultimately, it did not expressly adopt any approach—finding dismissal warranted under all of them. *Lincoln Property*, 920 F.3d at 906. Even though the plaintiff alleged "a possible statistical imbalance with the amount of voucher households in the census tract," it provided no "facts linking the no vouchers policy to the possible statistical disparity." *Id.* (citation modified). Under both *Reyes* opinions and *Oviedo*, the Fifth Circuit reasoned, city-level and census-level data provided by the plaintiff did not support an inference that the challenged policy (or a change in enforcement of the policy) caused "black persons to be the dominant group of voucher holders in the Dallas metro area [or any other census areas discussed]."*Id.* at 907. The plaintiff failed to allege facts "supporting a reasonable inference that [the defendants] bear any responsibility for the geographic distribution of minorities throughout the Dallas area prior to the implementation of the 'no vouchers' policy." *Id.* And, applying *Ellis*, the Fifth Circuit reasoned that the plaintiff would fail to state a claim even if it viably alleged causation because *Ellis* requires the policy to be artificial, arbitrary, and unnecessary. *Id.* at 907. A private entity's choice to opt out of a government program with voluntary participation (such as Section 8)—according to *Lincoln Property*—cannot be artificial, arbitrary, and unnecessary "absent the existence of pertinent, contrary factual allegations . . . ." *Id.* In that case, the Fifth Circuit found none. *Id.* It therefore found no error in the district court's dismissal of the claim. *Id.*

Judge Davis concurred in part and dissented in part. In his view, the majority's approach to disparate-impact cases "turns disparate-impact liability on its head" by requiring "the plaintiff to establish that the offending policy not only had a disparate impact on a protected group, but that

somehow the policy also created the characteristics making the protected group susceptible to the disparate impact." *Id.* at 922 (Davis, J., concurring in part and dissenting in part). He used *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) to illustrate the point. *Id.* There, an employer adopted a policy requiring prospective employees to have a high school education or to pass standardized general intelligence tests. *Griggs*, 401 U.S. at 425–26. The evidence showed that white persons performed better on these requirements than black persons. *Id.* at 430. Because the employer was unable to show that these requirements were related to job performance, the Supreme Court found them unlawful. *Id.* at 433–36. In Judge Davis's view, the majority's holding would have required "the plaintiffs in *Griggs* to show that their employer's policy caused Black persons not to have a high school education" to state a claim. *Lincoln Property*, 920 F.3d at 922 (Davis, J., concurring in part and dissenting in part).

In its defense, the majority reasoned that permitting disparate-impact liability based on a showing that a voucher ban disparately impacts minorities "would effectively mandate a landlord's participation in the voucher program any time the racial makeup of multi-family rental complex does not match the demographics of a nearby metropolitan area." *Id.* at 909 (majority opinion). In the majority's view, "if such a burdensome and extreme mandate were to be attempted, it should be expressly legislated by Congress . . . ." *Id.*

The petition for rehearing en banc was denied. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 930 F.3d 660 (5th Cir. 2019) ("*Lincoln Property II*"). The dissenting judges read *Lincoln Property* to create "an impossible pleading standard." *Id.* at 661 (Haynes, J., dissenting). In their view, the majority overstated the robust causation requirement imposed by *ICP*, a case decided at the summary judgment stage, and ignored *Lincoln Property*'s Rule 12(b)(6) posture. *Id.* at 664

18

(Haynes, J., dissenting). The dissent casts *Lincoln Property*'s conclusion—that a plaintiff must allege either that a policy caused a pre-existing condition or that a change in enforcement caused a disparate impact—as unsupported by precedent. *Id.* at 665 (Haynes, J., dissenting).

Whether the majority got it right is not for this Court to decide. Accordingly, it proceeds to evaluate whether Plaintiffs state a disparate-impact claim under *Lincoln Property*. In the wake of *Lincoln Property*, a plaintiff must plausibly allege that a challenged policy robustly causes a discriminatory effect to state a prima facie case. 920 F.3d at 902. The burden then shifts to the defendant, providing it "leeway to state and explain the valid interests served by the defendant's policies." *Id.* (citation modified). If the defendant meets its burden, the plaintiff must then show that the defendant's interests could be served by another practice that has a less discriminatory effect. *Id.* at 906 (citation modified).[8]

### B.    Application of *Lincoln Property* to Plaintiffs' Disparate-Impact Claims

The *Johnson* Plaintiffs and McKinney Housing (for this section, the "Disparate-Impact Plaintiffs")[9] fail to plausibly allege a prima facie disparate-impact claim for two main reasons. First, they do not plausibly allege that the challenged policies caused black or female tenants to be the predominant group of voucher holders in Providence. Second, they do not plausibly allege that a change in enforcement of the policies disparately impacted black or female tenants. As a result,

---

[8]    In an unpublished opinion applying *Lincoln Property*, the Fifth Circuit stated that it "goes without saying that, at the Rule 12(b)(6) stage, [the] plaintiff need only plausibly allege" the "first prong" of the burden-shifting framework. *Inclusive Cmtys. Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 824 F. App'x 210, 214 (5th Cir. 2020) (per curiam) (unpublished). *Lincoln Property*, however, cited the district court's findings under the "third step" of the burden-shifting framework without disapproval—even though the case was also decided at the Rule 12(b)(6) stage. *See Lincoln Property*, 920 F.3d. at 906 (noting the district court's finding that the plaintiff's complaint identified the defendants' business and financial concerns associated with accepting voucher holders). This Court need not determine whether this lack of disapproval amounts to an endorsement because it dismisses the disparate-impact claims based on the first step of the framework.

[9]    Denton Housing does not pursue a disparate-impact claim.

they do not plausibly allege robust causation under *Lincoln Property*. Accordingly, dismissal of each disparate-impact claim is required.

> **1.**     **Plaintiffs fail to plausibly allege robust causation under the *Reyes* dissent, *Oviedo*, and *Ellis* as interpreted by *Lincoln Property*.**

The Court places three of the four opinions the Fifth Circuit considered in *Lincoln Property* in the same bucket because they share a common element that is dispositive here. Namely, whether the challenged policy caused "black persons [or women] to be the dominant group of voucher holders" in Providence. *Lincoln Property*, 920 F.3d at 907. The arguments presented to the contrary lack merit. The Disparate-Impact Plaintiffs argue that:

> Unlike in *Lincoln Property*, the prior PHOA policy allowed leasing to voucher tenants, and as a result, a small number of voucher tenants leased homes in PHOA. The voucher tenants in PHOA slowly began to increase. Unlike in *Lincoln Property*, PHOA's prior leasing policy did cause the number of voucher tenants to be present in PHOA and it was not coincidental. Only after the number of Black voucher residents increased in PHOA did the PHOA change its leasing rules to enact the Unlawful Policy . . . *The prior PHOA policy caused the geographic location of the PHOA voucher group to be in PHOA because the prior policy allowed for the leasing of tenants, including voucher tenants.*

(*Johnson*, Dkt. #27 at p. 23 (emphasis added) (citation omitted); *McKinney*, Dkt. #30 at p. 25 (emphasis added) (citation omitted)).

However, the question is not whether Defendants caused voucher holders to live in Providence, but whether the challenged policy caused an FHA-protected class—here, black or female tenants—to be the "*dominant* group of voucher holders . . . ." *Lincoln Property*, 920 F.3d at 907 (emphasis added). There are no allegations that Defendants bear any responsibility for the "racial composition" of voucher holders in Providence "before [Defendants] implemented their 'no voucher' policy." *Id.* That view of robust causation would have allowed the plaintiff in *Lincoln Property* to state a claim because the defendant there also lacked a policy against voucher-holder

rentals before implementing one. This Court will not reinterpret *Lincoln Property*, so this argument is unavailing under the Fifth Circuit's interpretation of the *Reyes* dissent and *Oviedo*.

The Court turns to *Ellis*. As to that opinion, the question before the Court is whether *Lincoln Property*'s view of *Ellis* allows a plaintiff to state a claim by plausibly alleging that an artificial, arbitrary, and unnecessary policy caused a disparate impact. In other words, whether *Lincoln Property* excuses a plaintiff challenging an artificial, arbitrary, and unnecessary policy from plausibly alleging that defendants caused a protected class to be the "predominant" group of voucher holders. *See id.* at 907. It does not. Instead, for the reasons that follow, the Court concludes that the Fifth Circuit read *Ellis* to impose an *additional* requirement.

First, *Lincoln Property* itself holds that *Ellis* requires the challenged policy to be artificial, arbitrary, and unnecessary "*even if causing* a 'problematic disparity.'" *Id.* (emphasis added). The Court is skeptical that the Fifth Circuit intended to imbue "causing" with a lighter standard than the one preceding it. When the Fifth Circuit discussed a variance in the robust causation requirement, it made that variance explicit. *See id.* at 906 (explaining that, under the *Reyes* majority test, a mere disparate impact can show robust causation, but only if caused by a "change" in the challenged policy's enforcement (emphasis omitted)). If the *Lincoln Property* majority intended to alleviate plaintiffs using the *Ellis* test from plausibly alleging that the challenged policy caused FHA-protected classes to be the dominant group of voucher holders, it could have added a similar qualifier. Thus, the Court is unpersuaded that a mere disparate impact—without a plausible allegation that the policy caused a protected class to be the dominant group of voucher holders—is sufficient to state a claim under the Fifth Circuit's view of *Ellis*.

Second, persuasive authority supports the Court's conclusion. In *Inclusive Communities Project, Inc. v. Heartland Community Association, Inc.*, 824 F. App'x 210, 217 (5th Cir. 2020) (per curiam) (unpublished), the Fifth Circuit again addressed robust causation in a housing discrimination case challenging a voucher ban. Like the Court does here, *Heartland* read *Lincoln Property* to "require *either* [that]: a change in the defendant's enforcement of a policy caused a disparate impact; or [that] a challenged policy caused the relevant minority group to be the dominant group of those affected by the policy." *Id.* at 217 (emphasis added) (citation modified) (first citing *Lincoln Property*, 920 F.3d at 906; then citing *Lincoln Property*, 920 F.3d at 921 (Davis, J., concurring in part and dissenting in part)). Judge Davis interpreted *Lincoln Property* the same way—"to require the plaintiff in a disparate-impact claim under the FHA to establish that the challenged policy was previously unenforced *or* that the challenged policy caused a 'pre-existing condition.'" *Lincoln Property*, 920 F.3d at 921 (Davis, J., concurring in part and dissenting in part) (emphasis added). Judge Haynes's dissent to the denial of rehearing en banc also supports the Court's conclusion that alleging an artificial, arbitrary, and unnecessary policy caused a disparate impact is insufficient to state a disparate-impact claim in this Circuit. *See Lincoln Property II*, 930 F.3d 660 (Haynes, J., dissenting) ("Requiring a change in enforcement to prove disparate impact would eliminate disparate impact liability for those entities that, at the outset, institute a policy that is *artificial, arbitrary, or unnecessary, and also causes a statistical disparity*." (emphasis added)).

Although non-binding, these authorities provide additional support for the Court's conclusion that an artificial, arbitrary, and unnecessary policy coupled with a disparate impact is

insufficient to state a disparate-impact claim under *Lincoln Property*.[10] Rather, a plaintiff must plausibly allege that that the policy caused a protected class to be the dominant group of voucher holders, and, under *Ellis*, must also allege that the policy was artificial, arbitrary, and unnecessary. Here, the Disparate-Impact Plaintiffs do not clear the first hurdle. While they plausibly allege that Defendants' policy affected more black and female tenants than white and male tenants because, comparatively, more black and female tenants use vouchers to pay rent, this is insufficient under *Lincoln Property*.

In sum, Plaintiffs do not state a claim under the Fifth Circuit's interpretation of the *Reyes* dissent, *Oviedo*, or *Ellis* because they do not plausibly allege that the challenged policies caused black or female tenants to be the dominant group of voucher holders in Providence. *Lincoln Property*, 920 F.3d at 906–07. Like the district court in *Heartland*, this Court finds that the "the statistical racial disparities relied upon by [the Disparate-Impact Plaintiffs] preexisted the enactment of the [challenged policies] and, therefore, cannot be shown to have been caused by [them]." *Inclusive Cmtys. Project, Inc. v. Heartland Cmty. Ass'n, Inc.*, 399 F. Supp. 3d 657, 668 (N.D. Tex. 2019), *aff'd*, 824 F. App'x 210 (5th Cir. 2020).

---

[10] An additional persuasive authority supports the Court's conclusion that plausibly alleging a disparate impact was caused by an artificial, arbitrary, and unnecessary policy is insufficient to state a claim. The Eastern District of Louisiana applied *Lincoln Property* in a case challenging an occupancy limit as discriminatory towards families with children. *Treece v. Perrier Condo. Owners Ass'n, Inc.*, 519 F. Supp. 3d 342, 345, 352 (E.D. La. 2021), *as modified by*, 569 F. Supp. 3d 347 (E.D. La. 2021). The court found that the policy had a substantial discriminatory effect on families with children. *Id.* at 346. Nevertheless, it held that the plaintiffs failed to make a prima facie disparate-impact case because they failed to show either that a change in enforcement caused a disparate impact, or that the policy caused families with children to be the predominant group of households to have more members. *Id.* at 362–63.

**2.    Plaintiffs fail to state a claim under the *Reyes* majority opinion as interpreted by *Lincoln Property*.**

Applying the Fifth Circuit's interpretation of *Reyes*, the Disparate-Impact Plaintiffs cannot state a claim because they do not plausibly allege a change in the challenged policy's enforcement. To avoid this result, they argue that "[p]rior to the PHOA ban on vouchers, leasing to voucher tenants was permitted in the PHOA under their rules," making the Voucher Ban a change in enforcement.[11] The argument fails, however, because it conflates a change in policy with a change in its enforcement. After all, the Disparate-Impact Plaintiffs do not allege that the Voucher Ban was once administered one way and now administered a different way (like the plaintiff in *Reyes*). *See Lincoln Property*, 920 F.3d at 904. Instead, they argue that the Voucher Ban once did not exist and now does. If this alone were sufficient, plaintiffs could plausibly allege a change in enforcement any time a new policy is issued. *Lincoln Property* does not endorse that result. *See id.* at 904–09. Accordingly, Plaintiffs fail to state a claim under the Fifth Circuit's interpretation of *Reyes*.

To summarize, the Disparate-Impact Plaintiffs do not state a claim under *Lincoln Property* because they do not plausibly allege robust causation. Specifically, they do not plausibly allege that the challenged policies caused black or female tenants to be the predominant group of voucher holders in Providence, or that a change in enforcement of the challenged policies caused a disparate impact. As a result, the Court will dismiss the disparate-impact claims in *Johnson* and *McKinney*.

**II.    Plaintiffs state a disparate-treatment claim.**

The Fair Housing Act makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of" race. 42 U.S.C. § 3604(a). The Supreme Court has interpreted

---

[11]    (*Johnson*, Dkt. #27 at p. 22; *McKinney*, Dkt. #30 at p. 24).

this section as a prohibition on disparate treatment that parallels Title VII and the Age Discrimination in Employment Act (ADEA). *ICP*, 576 U.S. at 534–35.

As to Plaintiffs' disparate-treatment claims, the principal question before the Court is whether a racially motivated voucher ban can give rise to disparate-treatment liability even when it bans voucher holders of all races. If so, the next question is whether Plaintiffs plausibly allege that race motivated Defendants' implementation of the Voucher Ban here. Ultimately, the Court finds that the answer to both questions is yes. To begin, the Court returns to *Lincoln Property* to analyze why the plaintiff failed to state a disparate-treatment claim there. Then, the Court explains why *Lincoln Property* does not compel dismissal here.

### A.    Disparate-Treatment Liability After *Lincoln Property*

In *Lincoln Property*, the Fifth Circuit considered two different disparate-treatment theories arising from a voucher ban at the pleading stage. The first theory was asserted against a property management company and the property owners it serviced. *Lincoln Property*, 920 F.3d at 911. After those defendants enacted a voucher ban, the plaintiff nonprofit housing organization offered to serve as sublessor or guarantor for its low-income clients. *Id.* at 898. The defendants allegedly negotiated with first-time renters, renters with low credit scores, students subsidized by parents, and corporations subleasing to employees—but refused to do the same with the plaintiff, who had predominantly black clients. *Id.* at 911. That conduct, according to the plaintiff, raised an inference of intentional race discrimination. *Id.*

The Fifth Circuit disagreed, refusing to "automatically view" a no-voucher policy as a "no black tenants" policy without well-pleaded factual support. *Id.* (citation modified). Differential treatment between those subsidized by the government and those subsidized by other sources—like students subsidized by parents—was "merely consistent with liability" and did not

raise a "*reasonable*, rather than speculative, inference of intentional discrimination." *Id.* (citation

modified). Further, the Fifth Circuit reasoned that:

> Nor is it plausible, based solely on [the plaintiff's] conclusory assertions, that the
> proposed subleases and guarantees render [the plaintiff] and its government
> voucher beneficiaries sufficiently similarly situated to business entities subleasing
> rental units to their employees, and credit-worthy parents serving as guarantors for
> students, such that [the defendants'] lack of response is indicative of intentional
> race discrimination.

*Id.*

For those reasons, the plaintiff's first theory of disparate treatment fell short at the pleading

stage. *Id.* The second disparate-treatment theory was asserted only against the property manager,

Lincoln. *Id.* The Fifth Circuit viewed this theory more favorably because the plaintiff alleged that

Lincoln refused "to negotiate with or rent to otherwise qualified voucher households in *majority*

*white* areas while, at the same time, negotiating with and renting to voucher holders in *majority*

*minority* areas . . . ." *See id.* Yet, the plaintiff failed to state a claim because its allegations "were

insufficiently clear to provide the necessary certainty." *Id.* at 911. Specifically, the allegations did

not make it clear whether Lincoln accepted vouchers in predominantly minority areas because it

was required to do so by law or contract. *Id.* "On such a bare showing," the Fifth Circuit found "no

error in the district court's dismissal of the claim." *Id.* at 912. Thus, both disparate-treatment

theories failed at the pleading stage, with no noted dissents.

Accordingly, in the wake of *Lincoln Property*, the *McDonnell Douglas* burden-shifting

evidentiary standard in disparate-treatment cases under § 3604(a) requires the plaintiff to first:

> allege facts supporting a prima facie case of (1) membership in protected class, (2)
> that the plaintiff applied and was qualified to rent or purchase housing; (3) that the
> plaintiff was rejected, and (4) that the housing thereafter remained open to similarly
> situated applicants after the plaintiff was rejected.

*Id.* at 910 (first citing *Petrello v. Prucka*, 484 F. App'x 939, 942 (5th Cir. 2012) (per curiam) (unpublished); then citing *Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 371 (6th Cir. 2007)).[12]

If a prima facie case is alleged, a defendant may "offer a legitimate, non-discriminatory reason for the rejection." *Id.* at 911. If it does, the "burden shifts back to the plaintiff to rebut the reason offered . . . by showing it is a pretext for discrimination." *Id.*

### B.    Application of *Lincoln Property* to Plaintiffs' Disparate-Treatment Claims

The first issue is whether Defendants correctly argue that they cannot be liable for disparate treatment because the Voucher Ban excluded voucher holders of all races. Ultimately, the Court disagrees. The next issue is whether Plaintiffs plausibly allege that race motivated the Voucher Ban here. The Court finds that they do. Thus, as to disparate treatment, the Motions will be denied.

#### 1.    Defendants may be liable for disparate treatment despite the neutral application of the Voucher Ban.

Defendants principally rely on the unpublished *Heartland* decision to argue dismissal is required. In that case, a plaintiff challenging a voucher ban under a disparate-treatment theory failed to state a claim at the Rule 12(b)(6) stage. *Heartland*, 824 F. App'x at 220–21. When addressing the similarly situated element of disparate treatment, *Heartland* stated the following:

---

[12] *Petrello* cites *Lindsay v. Yates*, 498 F.3d 434, 438–39 (6th Cir. 2007) when explaining the *McDonell Douglas* framework. *Lindsay* describes the burden-shifting framework as follows:

> First, a plaintiff who alleges discrimination on the basis of race must make out a prima facie case by showing (1) that he or she is a member of a racial minority, (2) that he or she applied for and was qualified to rent or purchase certain property or housing, (3) that he or she was rejected, and (4) that the housing or rental property remained available thereafter. If the plaintiff satisfies the prima facie requirements, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for rejecting the plaintiff. Finally, the burden shifts back to the plaintiff to show that the defendant's proffered non-discriminatory reason is a pretext.

498 F.3d at 438–39 (citation modified).

As an initial matter, [the plaintiff] does not satisfy the elements required to state a prima facie disparate-treatment claim: it fails to plausibly allege any Heartland housing would be available to similarly situated renters after the policy's enactment *because no voucher holders of any race will be able to rent in Heartland.* [The plaintiff's] allegation *that 32% of black and 53% of white renter households will still be able to afford to rent in Heartland, despite the policy, does not satisfy the fourth element of the prima facie test because these renters are dissimilar from voucher holders: they can afford rent without a voucher.*

*Id.* at 220 (emphasis added).

Relying on this language, Defendants argue that all three cases must be dismissed here because the Voucher Ban excluded voucher holders of all races. Defendants are wrong for two main reasons. First, even if Defendants correctly read *Heartland* to require that result, *Lincoln Property* does not. The Court is bound to follow *Lincoln Property* over an unpublished decision. Second, Fifth Circuit and Supreme Court authority indicate that the prima facie elements are not dispositive—particularly at the pleading stage.

### a.    *Lincoln Property* rejects Defendants' argument.

*Lincoln Property* does not compel dismissal because the Plaintiffs in this case do not ask the Court to equate a facially neutral policy's disparate impact with a discriminatory motive. It is true, as Defendants highlight across all six of their motions, that *Lincoln Property* states the disparate-treatment pleading standard in a way that, out of context, suggests a voucher holder can never state a claim when the defendant applies a voucher ban neutrally. *See Lincoln Property*, 920 F.3d at 910 ("[T]o *state a claim* for disparate treatment under § 3604(a), the plaintiff *must* allege facts supporting a prima facie case [including that] *housing . . . remained open to similarly situated applicants after the plaintiff was rejected.*" (emphasis added)). But when considering the full opinion, the Court disagrees that *Lincoln Property* immunizes defendants from liability when they make housing unavailable to all races through a racially motivated policy.

28

In *Lincoln Property*, the district court dismissed the plaintiff's disparate-treatment claims because the defendants refused to rent to or negotiate with voucher holders "regardless of race or color," leading it to conclude that the plaintiff's true issue was "with the existence of [the defendant's] policy, which is indicative of disparate impact rather than disparate treatment." *Id.* at 909. For that reason, the district court deemed the disparate-treatment claims "mislabeled." *Id.*

The Fifth Circuit affirmed the dismissal of the claims but disapproved the "mislabeling" analysis. *Id.* at 910. The theory was not mislabeled, the Fifth Circuit reasoned, because it alleged that the "*true* rationale for the facially neutral 'no vouchers' policies is the race of the voucher tenants, *not* the means (vouchers) by which rent is paid." *Id.* The Fifth Circuit explained that "so long as the requisite discriminatory intent is present, a seemingly race-neutral policy can give rise to actionable disparate treatment." *Id.* (first citing *ICP*, 576 U.S. at 533; then citing *Greater New Orleans Fair Housing Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563 (E.D. La. 2009)).

Here, the Court is unpersuaded that dismissal is required because Defendants' logic imitates the very reasoning the Fifth Circuit rejected. *Id.* at 909–10 (explaining that a disparate-treatment claim in a voucher-ban case is potentially viable when it alleges the "*true* rationale" is "the race of the voucher tenants, *not* the means (vouchers) by which rent is paid."). Instead, what proved fatal to the plaintiff in *Lincoln Property* was that it impermissibly equated a voucher ban with a no-black-tenant policy:

> In this instance, the vague and conclusory allegations of disparate treatment that [the plaintiff] asserts collectively against [defendants] are legally insufficient to support *a reasonable inference of intentional race discrimination*. In short, [the plaintiff] essentially asks the panel to *automatically* view a "no voucher tenants" policy as synonymous with a "no black tenants" policy without providing adequate (well-pleaded) factual support for that linkage (as opposed to conclusory statements and assertions based on speculation, assumptions, and stereotypes).

*Id.* at 911 (emphasis added).

This analysis suggests that the Fifth Circuit's central focus was determining whether a reasonable inference of intentional race discrimination was alleged—not whether the plaintiff satisfied a formulaic application of the prima facie case at the pleading stage. The Fifth Circuit could have affirmed dismissal on the fact that the defendants "refused to rent to or negotiate with Section 8 voucher holders regardless of race or color," but went out of its way to reject that analysis. *Id.* at 909–10 (citation modified).

Further, the Court finds the Fifth Circuit's reliance on *St. Bernard* when cautioning district courts about the "mislabeling" issue instructive. *Id.* at 910. In that case, the plaintiff successfully challenged "a moratorium on the construction of all multi-family housing . . . ." *St. Bernard*, 641 F. Supp. 2d at 566 (emphasis added). Even though the policy made multi-family housing unavailable to all races, the court proceeded to analyze whether "race was a consideration and played some role in the real estate transaction." *Id.* at 569 (citing *Hanson*, 800 F.2d at 1386). To that end, the *St. Bernard* court applied a non-exhaustive list of discriminatory-intent factors derived from *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977).[13]

*Lincoln Property* also cites *Arlington Heights* with approval. *Lincoln Property*, 920 F.3d at 910. *Arlington Heights*, for its part, cautions that determining whether race motivated a policy is a "sensitive inquiry." 429 U.S. at 266. The key question is "whether racially discriminatory intent existed." *Id.* at 268. *Lincoln Property*'s reliance on *St. Bernard* and *Arlington Heights* indicates that

---

[13] *Arlington Heights* provides that whether an adverse housing decision "bears more heavily on one race than another . . . may provide an important starting point." 429 U.S. at 266. Other relevant factors include the historical background of the decision, the specific sequence of events leading up to the challenged decision, procedural departures from the usual decision-making process, substantive departures, and the legislative or administrative history of the decision. *Id.* at 266–68.

the Fifth Circuit did not foreclose challenges to neutral policies when adequate factual support bolsters allegations that those policies were motivated by race.

> **b.** **Other Fifth Circuit and Supreme Court precedent rejects Defendants' argument.**

The Court is unpersuaded that the Fifth Circuit imposed a heightened pleading standard in housing discrimination cases that raise plausible allegations that race was the true rationale animating a voucher ban's enactment. Rather, like the Fifth Circuit reminded courts in a discrimination case decided the same year as *Lincoln Property*, the relevant inquiry at this stage is whether the plaintiff sufficiently pleads "the ultimate elements of a [disparate-treatment] claim." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019).

In *Cicalese*, the Fifth Circuit clarified that the burden shifting framework may be "helpful to reference" when analyzing the plausibility of a disparate-treatment claim that relies on circumstantial evidence, but that courts "err[] by requiring a plaintiff to plead something more than the ultimate elements of [the] claim." *Id.* at 766–67 (citation modified). The Fifth Circuit therefore rejected a district court's analysis that "scrutinize[ed] whether . . . fellow employees were really similarly situated . . . and whether derogatory statements . . . amounted to stray remarks" at the pleading stage. *Id.* at 768 (citation modified). Those matters, in the Fifth Circuit's view, were "more suited to the summary judgment phase." *Id.* (collecting cases). As a result, *Cicalese* held that the plaintiffs' allegations that "various actions against them were motivated by anti-Italian bias" alleged "sufficient facts to nudge their claims across the line from conceivable to plausible." *Id.* at 768 (citation modified). *See also Jenkins v. City of Dallas*, 717 F. Supp. 3d 528, 537 (N.D. Tex. 2024) ("[T]he plausibility of a discrimination claim does not hinge on alleging a comparator" (first citing *Cicalese*, 924 F.3d at 768; then citing *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).

In *Raj*, a Title VII case, the Fifth Circuit held that a district court erred by "improperly substituting" the prima facie "evidentiary standard for a pleading a requirement." 714 F.3d at 331 (citation modified). The Fifth Circuit reasoned that the "ultimate question" in a Title VII disparate-treatment claim "remains whether a defendant took the adverse employment action against a plaintiff *because of* her protected status." *Id.* (citation modified). It thus held that requiring a "showing of each prong of the prima facie test" at the pleading stage was improper. *Id.* The plaintiff in that case still failed to state a claim, but the Fifth Circuit's analysis casts doubt on Defendants' contention that a comparator allegation is required to state a disparate-treatment claim. The Fifth Circuit reasoned that the plaintiff "did not allege any facts, direct or circumstantial, that would suggest [the defendant's] actions were based on . . . race or national origin *or* that [the defendant] treated similarly situated employees of other races or national origin more favorably." *Id.* (emphasis added).[14]

That analysis helps demonstrate that the requirements to state a disparate-treatment claim are flexible and context-dependent. *Lincoln Property*'s application of the "similarly situated" element at the pleading stage makes sense in the context of that case because the plaintiff there relied on a policy's disparate impact *without* plausibly alleging that race motivated its enactment. *See id.* at 911. Allowing the case to proceed under those circumstances would have exposed a defendant to liability for the "geographic distribution of minorities," the result the Fifth Circuit

---

[14] *See also Sanchez v. Chevron N. Am. Expl. & Prod. Co.*, No. 20-30783, 2021 WL 5513509, at *5 (5th Cir. Nov. 24, 2021) (per curiam) (unpublished) ("A complaint need not allege 'each prong of the prima facie test for disparate treatment' in order to overcome a Rule 12(b)(6) motion; to support a disparate treatment claim under Title VII, though, it must plausibly set out facts that the 'defendant took the adverse employment action against a plaintiff *because of* her protected status'" (quoting *Raj*, 714 F.3d at 331)); *Thomas v. Dall. Indep. Sch. Dist.*, No. 23-10882, 2024 WL 2874367, at *3–4 (5th Cir. June 7, 2024) (unpublished) (explaining, in an ADEA case, that the 12(b)(6) standard requires allegations supporting the two ultimate elements of disparate treatment, while *McDonnell Douglas* goes to the "*ultimate proof*" that could show disparate treatment).

sought to avoid. *Lincoln Property*, 920 F.3d. at 907. The Court does not construe *Lincoln Property*'s recitation of the prima facie case or its analysis of the comparator allegations to eliminate disparate-treatment liability any time a voucher ban affects all races. Like the Fifth Circuit did in *Raj*, *Lincoln Property* describes the "burden-shifting . . . standard established for discrimination cases" based on circumstantial evidence as an "evidentiary" one. *Id.* at 910 (first citing *Petrello*, 484 F. App'x at 942; then citing *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003); and then citing *Cox v. Phase III, Invs.* No. CIV.A. H-12-3500, 2013 WL 3110218, at *8 (S.D. Tex. June 14, 2013)).

Supreme Court authority suggests the Fifth Circuit's wording was intentional. In *Swierkiewicz v. Sorema North America*, the Supreme Court held that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." 534 U.S 506, 510 (2002). And in a recent Title VII discrimination case, the Supreme Court cited *Swierkiewicz* when reminding courts not to perform "inflexible applications" of the prima facie case in disparate-treatment cases. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310 (2025). It explained that the "precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Id.* at 310–11 (citation modified). The *Swierkiewicz* case faced the question of "whether a complaint in an employment discrimination lawsuit must contain specific facts establishing a prima facie case of discrimination under the [*McDonnell Douglas*] framework." 534 U.S. at 508. It held that "an employment discrimination complaint need not include such facts and instead must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting FED. R. CIV. P. 8(a)(2)). This Court will likewise treat the burden shifting framework according to its evidentiary nature.

Defendants ask the Court to distinguish *Swierkiewicz* and *Cicalese* because they are not housing discrimination cases like *Lincoln Property*. The Court sees no reason to do so. *Lincoln Property* was concerned with limiting *disparate-impact* liability to "avoid the serious constitutional questions that might arise under the FHA, for instance, if such liability were imposed based *solely on a showing of a statistical disparity.*" *Lincoln Property*, 920 F.3d at 902 (emphasis added) (quoting *ICP*, 576 U.S. at 540); *see id.* at 909 (explaining that its ruling avoids "mandat[ing] a landlord's participation in the voucher program any time the racial makeup of [a] multi-family rental complex does not match the demographics of a nearby metropolitan area."); *see also id.* at 901 ("[T]he voluntary nature of landlord participation in the voucher program does not render it immune from liability if actionable discrimination under the FHA is established."). The opinion expressed no intent to impose a higher pleading standard than that imposed in other disparate treatment cases. In fact, when explaining that disparate-treatment claims remain viable even when a plaintiff challenges a facially neutral voucher ban, *Lincoln Property* references the employment discrimination context. *Id.* at 910 ("[A neutral action] is often [at issue] in employment discrimination cases where the proffered (neutral) rationale for an adverse employment action allegedly is pretext for discrimination."). After all, the text of both the Fair Housing Act and Title VII prohibits adverse actions taken "because of" race. *ICP*, 576 U.S. at 535 (citation modified).

Defendants' authorities do not support the conclusion that the disparate-treatment prima facie elements are dispositive at the pleading stage. *Mandawala v. Struga Management* considered a district court's findings after a bench trial. No. 21-50644, 2023 WL 2712500, at *2 (5th Cir. Mar. 30, 2023) (unpublished) (per curiam). And *Crain v. City of Selma* considered a district court's order

granting summary judgment. 952 F.3d 634, 640 (5th Cir. 2020). Thus, these cases do not compel Rule 12(b)(6) dismissal.

Moreover, a heightened pleading standard requiring factual allegations that housing remained open to similarly situated persons in all disparate-treatment cases would eliminate liability when a defendant refuses "to rent or negotiate with Section 8 voucher holders regardless of race or color"—the very analysis the Fifth Circuit rejected in *Lincoln Property*. *See id.* at 909–10 (footnote omitted). Such a standard would also cast doubt on *Lincoln Property*'s reminder that a neutral policy can give rise to disparate-treatment liability. *See id.* at 910. Without binding precedent compelling a heightened pleading standard, the Court will not impose one here.

Here, unlike in *Lincoln Property*, plausible allegations that race motivated a neutral policy exist. Moreover, the plaintiff's clients in *Lincoln Property* and the tenants in this case differ significantly. The former were rejected or wait-listed applicants who wanted to live in the properties Lincoln managed, but the tenants in this case already qualified to live in Providence—and were allegedly forced to leave their homes before the expiration of their leases. Accordingly, the Court will not apply a rigid, formulaic application of the prima facie case in the materially different context in which these cases arise. *See Ames,* 605 U.S. at 311 (explaining that the disparate-treatment prima facie case can vary depending on the context and was never intended to be "rigid, mechanized, or ritualistic" (quoting *Swierkiewicz*, 534 U.S. at 512)).[15] The Court therefore proceeds to analyze whether Plaintiffs plausibly allege that Defendants implemented the Voucher Ban because of the race of the voucher holders rather than the means they use to pay rent.

---

[15] Justice Thomas, who authored *Swierkiewicz* for a unanimous Supreme Court, recently observed that the *McDonnell Douglas* framework has no basis in statutory text and was originally developed as an evidentiary tool for bench trials. *Ames*, 605 U.S. 303, 319–20 (Thomas, J., concurring).

### 2.    Plaintiffs plausibly allege disparate-treatment claims.

After reviewing each complaint individually, the Court finds that Plaintiffs state plausible disparate-treatment claims. Plaintiffs do not ask this Court to automatically equate the Voucher Ban with a no-black-tenant policy based solely on disparate impact. Rather, Plaintiffs plausibly allege facts giving rise to a reasonable inference that race "motivated" the Voucher Ban's enactment despite its neutral application. *Lincoln Property*, 920 F.3d at 909–11; *see also Arlington Heights*, 429 U.S. at 266–68. As a result, Rule 12(b)(6) dismissal is unwarranted.

As an important starting point, Plaintiffs have plausibly alleged that the Voucher Ban had a substantially disparate impact on black tenants. *Lincoln Property*, 920 F.3d at 910 (quoting with approval *Arlington Heights*'s statement that disparate impact may provide an important starting point when analyzing discriminatory intent). Providence's voucher-holder population was 93% black when Defendants implemented the Voucher Ban. And, here, the voucher holders are not rejected applicants like in *Lincoln Property*, but a predominantly black population that already lived in Providence and was allegedly forced to leave.

Further, Plaintiffs' allegations detail events leading up to the Voucher Ban that suggest race motivated its enactment, including that Board members participated in discussions using racially coded language. *See St. Bernard*, 641 F. Supp. 2d at 571 ("The references to 'ghetto,' 'crime,' 'blight,' and 'shared values' are similar to the types of expressions that courts in similar situations have found to be nothing more than camouflaged racial expressions" (citation modified)). For example, in response to a post showing a black man's mugshot with the caption "Hide Your kids cause section 8 is on the loose!!!" Dautrich allegedly commented that "[f]or some reason our zip code has become a hub for section 8 [voucher holders]," and "only so many should be allowed in any neighborhood." As another example, Plaintiffs allege that a different Board member wrote "it's

called Section 8 . . . It seems like the neighborhood is plagued with convicts, GET OUT!!!" And while Defendants make much of the fact that Plaintiffs do not specify when this comment (and others) occurred, the inquiry at this stage is plausibility. *See Cicalese*, 924 F.3d at 768 (disapproving the district court's analysis which, at the pleading stage, scrutinized the plaintiff's failure to allege "when and how many times" derogatory remarks against Italians were made).

Plaintiffs have also plausibly alleged that Defendants procedurally departed from their decision-making process when enacting the Voucher Ban—through actions like circumventing a community vote and holding the voting period for the Amendment (which facilitated the Voucher Ban) open indefinitely.

The Court finds that Plaintiffs' allegations, together, are sufficient to nudge their disparate-treatment claims from conceivable to plausible. *Cicalese*, 924 F.3d at 768. Plaintiffs plausibly allege facts supporting the ultimate elements of disparate treatment: that the Voucher Ban was enacted because of the race of the voucher holders, not the means they use to pay rent. At the pleading stage, that is enough. Whether Plaintiffs can prove their contentions is a question for another day. Accordingly, as to disparate treatment, the Motions will be denied.[16]

## III.    Dismissal of Plaintiffs' other causes of action is not warranted at this stage.

Defendants also seek dismissal of several causes of action unaddressed by *Lincoln Property*. All Plaintiffs allege hostile housing environment harassment.[17] The *Johnson* Plaintiffs and

---

[16] The Court considered Defendants' other arguments that dismissal is required. After resolving "all questions of fact and . . . ambiguities in the controlling substantive law" in Plaintiffs' favor, the Court finds that none of the arguments are dispositive at the pleading stage given the facts alleged. *Lincoln Property*, 920 F.3d at 899 (citation modified) (providing Rule 12(b)(6) standard).

[17] It is uncertain whether a hostile housing environment claim is viable in this Circuit. *See Baker v. Waterford Square Homeowners Ass'n*, 57 F. App'x 211, 2003 WL 147532, at *3 (5th Cir. 2003) (per curiam) (observing that other circuits have recognized the claim by analogy to Title VII).

McKinney Housing also allege racial intimidation, and McKinney Housing seems to allege retaliation. Additionally, each Plaintiff seeks injunctive and declaratory relief.

After reviewing Plaintiffs' pleadings and the arguments presented in the briefs, the Court finds that Plaintiffs have stated plausible claims for relief under Rule 12(b)(6). Dismissal is unwarranted. Accordingly, as to these claims, the Motions will be denied.

## CONCLUSION

It is therefore **ORDERED** that:

- In Civil Action No. 4:25-cv-418, Defendant Providence Homeowners Association Inc.'s Motion to Dismiss (Dkt. #17) is **GRANTED in part** and **DENIED in part**, and Defendant FirstService Residential Texas, Inc.'s Motion to Dismiss (Dkt. #16) is **GRANTED in part** and **DENIED in part**.

- In Civil Action No. 4:25-cv-467, Defendant Providence Homeowners Association Inc.'s Motion to Dismiss (Dkt. #21) is **GRANTED in part** and **DENIED in part**, and Defendant FirstService Residential Texas, Inc.'s Motion to Dismiss (Dkt. #20) is **GRANTED in part** and **DENIED in part**.

- In Civil Action No. 4:25-cv-774, Defendant Providence Homeowners Association Inc.'s Motion to Dismiss (Dkt. #10) is **DENIED**, and Defendant FirstService Residential Texas, Inc.'s Motion to Dismiss (Dkt. #11) is **DENIED**.

It is further **ORDERED** that McKinney Housing and the *Johnson* Plaintiffs' disparate-impact claims are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

**SIGNED this 5th day of January, 2026.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE